## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

UNITED STATES of AMERICA )
)
v. )
) **Criminal No.**
DAVID E. GORSKI, ) **12-10338-FDS**
)
Defendant. )
_____)

## MEMORANDUM AND ORDER ON MOTION FOR
## LEAVE TO FILE AND MOTION FOR RECONSIDERATION

**SAYLOR, J.**

This is a criminal prosecution arising out of allegedly false representations concerning a corporation's eligibility to obtain contracts as a service-disabled veteran-owned small business ("SDVOSB"). Defendant David Gorski is charged with one count of conspiracy to defraud the United States in violation of 18 U.S.C. § 371 and four counts of wire fraud in violation of 18 U.S.C. § 1343. The government contends that Gorski, who operated a company called Legion Construction, Inc., misrepresented that Legion was a SDVOSB in order to qualify for and obtain government contracts.

On June 19, 2013, the government moved to disqualify attorney Tracy Miner, counsel for defendant. It contended that attorney Miner has an actual or serious potential conflict of interest because attorneys from her firm, Mintz, Levin, Cohen, Ferris, Glovsky, and Popeo, PC ("Mintz Levin"), participated in certain of the underlying events and could be witnesses in the trial of this case. On January 2, 2014, Magistrate Judge Jennifer Boal denied the government's motion.

The government has filed a motion for reconsideration of the Magistrate Judge's decision, contending that it was clearly erroneous and contrary to law. For the following

reasons, the motion will be denied without prejudice, subject to the execution of a more comprehensive waiver of potential conflicts by the defendant.

I.    **Background**

The facts are set forth in detail in the Magistrate Judge's order. A brief summary is outlined below.

A.    **Regulatory Scheme**

Pursuant to 15 U.S.C. § 644(g)(1)(A)(ii), at least three percent of all government contract awards must go to businesses that are owned by service-disabled veterans.[1] Regulations promulgated by the United States Department of Veterans Affairs ("VA") and the Small Business Association govern SDVOSB eligibility. To qualify as a SDVOSB under those regulations, an entity must be at least 51 percent owned by one or more service-disabled veterans. 38 C.F.R. § 74.3; 13 C.F.R. § 125.9. The entity must also be controlled by one or more service-disabled veterans. 38 C.F.R. § 74.4(c)(1); 13 C.F.R. § 125.10(a). "Control by one or more service-disabled veterans means that both the long-term decision[] making and the day-to-day management and administration of the business operations must be conducted by one or more service-disabled veterans . . . ." 13 C.F.R. § 125.10(a); *see also* 38 C.F.R. § 74.4(a) ("Control means both the day-to-day management and long-term decision-making authority for the [entity].").

Effective February 8, 2010, the VA regulations were amended to require that an eligible owner "work full-time in the business," replacing the previous requirement that "[o]wners need not work full time but must show sustained and significant time invested in the business."

---

[1] Although the statute has been amended three times since 2000, the three percent requirement has remained the same. *Compare* 15 U.S.C. § 644(g)(1)(A)(ii) (2014) *with* 15 U.S.C. § 644(g)(1) (2000).

*Compare* 38 C.F.R. § 74.4(c)(1) (2010) *with* 38 C.F.R. § 74.4(c)(1) (2008).

**B.      Legion Construction, Inc.**

Legion Construction, Inc., is a corporation based in Chelmsford, Massachusetts, that performs construction work.  According to the indictment, David E. Gorski is nominally a minority owner and vice president of Legion.  He is not a veteran.

In late 2005 or early 2006, Gorski allegedly recruited Joseph Steen, a veteran, to be the nominal 55 percent owner, founder, and president of Legion.  In April 2006, Gorski certified to the government that Legion was a SDVOSB.[2]  Legion was subsequently awarded government contracts from the VA, the General Services Administration, the Army, and the Navy.

On August 20, 2007, Legion underwent a corporate restructuring.  As part of the restructuring, Steen reduced his ownership to 11 percent and Gorski became a 49 percent owner. Peter Ianuzzi, also a veteran, became the owner of the remaining 40 percent.  After the restructuring, Legion continued to bid on and receive construction contracts from the VA.

On January 11, 2010, Legion submitted a bid on a VA construction contract for the agency's medical center in White River Junction, Vermont.  Legion was awarded the contract. On March 8, 2010, one of Legion's competitors, Ironclad Services, Inc., filed a bid protest with the SBA challenging Legion's status as a SDVOSB.  Ironclad alleged that Legion was improperly awarded the White River Junction contract because it was controlled by Gorski and not by one or more service-disabled veterans.

---

[2] According to the indictment, Gorski did so by utilizing the government's Online Representations and Certifications Application ("ORCA").  He also registered Legion with the VA as SDVOSB using the VetBiz website created by the VA.

Mintz Levin represented Legion in connection with the bid protest.[3] Samuel M. Starr, a partner at Mintz Levin, was the principal attorney handling that representation.

On April 5, 2010, Legion submitted a response to the SBA. The response contained a set of documents that showed that as of January 11, 2010, Steen and Ianuzzi owned 51 percent of Legion stock. (*See* Docket No. 41, Ex. D).

The response also stated that Legion had undergone a corporate restructuring while the bid for the contested VA contract was pending. It stated that Ianuzzi purchased Steen's share of Legion's stock on February 1, 2010. As proof, Legion submitted an affidavit from Ianuzzi stating, among other things: "On February 1, 2010, I purchased Joseph Steen's 11% of Legion's common stock and now I own 51% of Legion." (Docket No. 37-2, at 28). According to defendant, Legion's stock ledger, the stock purchase agreement, and Legion's stockholder agreement confirm that the transaction occurred on February 1, 2010.

Mintz Levin handled the corporate restructuring. It also drafted, or had a significant role in drafting, the Ianuzzi affidavit.

The government alleges that Legion's submission to the SBA contained material falsehoods about the restructuring. Specifically, it contends that Ianuzzi actually purchased Steen's stock in March 2010. The government further contends that Legion employed Mintz Levin to backdate the agreements to February 1, 2010. It contends Legion backdated the documents so that it could fraudulently claim that it was a SDVOSB under the new VA regulations that went into effect on February 8, 2010.

Gorski contends that the stock-transaction agreements had a legitimate effective date of

---

[3] According to defendant, Legion had retained Mintz Levin in 2009 to effectuate a corporate reorganization.

February 1, 2010.  He also claims that the practice of making agreements retroactive to ensure compliance with regulations is a common practice.

According to Gorski, Ianuzzi is now the president and sole shareholder of Legion.

**C.     The Indictment**

On October 23, 2012, a grand jury returned an indictment against Gorski, charging him with one count of conspiracy to defraud the United States in violation of 18 U.S.C. § 371 and four counts of wire fraud in violation of 18 U.S.C. § 1343.  The indictment alleges that Gorski caused Legion and Ianuzzi to submit the allegedly false representations outlined above.  Neither Legion nor Ianuzzi are defendants; Ianuzzi is an unindicted co-conspirator.  Steen died in 2010.

**D.     Representation by Mintz Levin**

At some point, attorney Tracy Miner of Mintz Levin began to represent Gorski in connection with the criminal proceedings.  She is lead counsel in this case, which is set to begin trial on September 29, 2014.  She has not represented Legion, as opposed to Gorski, in the criminal matter.  Miner contends that she had no role in the events of 2010 that are the subject of the indictment.

Until today (August 1, 2014), Miner was a partner at Mintz Levin.  She is now at a smaller firm, Demeo LLP.

Gorski is also represented by Eoin Beirne of Mintz Levin. Beirne is a non-equity partner at Mintz Levin.  There is no dispute that Miner is lead counsel for Gorski in the defense of this matter.

**E.     The Motion to Disqualify**

On June 19, 2013, the government filed a motion to disqualify attorney Miner as counsel

in this proceeding.  The government contended that attorney Miner should be disqualified because attorneys from Mintz Levin could serve as witnesses if (1) defendant asserted the defense of advice of counsel or (2) they were compelled to testify about their representation of Legion, assuming that the crime-fraud exception to the attorney-client privilege applied.

On July 16, in opposing the government's motion, defendant filed a written waiver of any actual or potential conflict of interest.  He represented that he did so after consulting with attorney Tom Kiley, who was independent counsel hired for that purpose.  The waiver was written as a letter to Gorski from attorney Miner, countersigned by Gorski.  It stated in relevant part:

> The Massachusetts Rules of Professional Conduct require that a lawyer may not represent a client if the representation of that client may be materially limited by the lawyer's own interests unless the lawyer believes that the representation will not be adversely affected and the client consents after consultation.  (Rule 1.7(b)).  I do not believe that our representation will be adversely affected by the Government's allegations as I do not believe that either Legion or Mintz Levin committed any criminal act in connection with the transactions involving our representation.  To the extent that the Government has made such allegations against Legion and Mintz Levin, our interest in disproving them is the same.

> By your signature below on this letter, you acknowledge that you want me and Mintz Levin to represent you and consent to my and this firm's representation of you despite the theoretical potential for conflict.  You expressly waive the right to bring a claim for ineffective assistance based on that potential conflict.  That waiver is to be narrowly construed and does not limit your right to bring a claim of ineffective assistance on any other applicable basis.

> You are encouraged to consult with independent counsel before signing this waiver so that you are fully aware of the consequences of executing the waiver.  Also, please don't hesitate to contact me with any questions or concerns before signing.

(Docket No. 41, Ex. G at 1).

The Magistrate Judge held hearings on the motion on August 12, October 15, and

December 5, 2013.[4]  At the hearing, defendant unequivocally acknowledged the risks of any

potential conflicts with attorney Miner or Mintz Levin and waived those conflicts.  The

Magistrate Judge first explained to defendant that he had a Sixth Amendment right to counsel

and to representation that was free from conflict.  (*Foster* Hearing Tr., Docket No. 102 at 6:2-7).

She also explained that his lawyer's advocacy may be compromised even where there is a waiver

of the conflict, and that the Court has an independent interest in ensuring that criminal trials were

conducted within the ethical standards of the legal profession.  (*Id.* at 6:10-17).  She then

explained the potential conflicts under the advice-of-counsel defense and the crime-fraud

exception to the attorney-client privilege.  (*Id.* at 7:7-9:8).

> The Magistrate Judge then took defendant's waiver:
>
> Q:     All right.  Mr. Gorski, do you understand that Ms. Miner may have a conflict with
>        regard to representing you as a result of her firm's prior representation of Legion
>        Construction?
>
> A:     Yes, Your Honor.
>
> Q:     Do you understand the risks to you personally if Ms. Miner remains in the case?
>
> A:     Yes.
>
> Q:     Do you understand that if you wanted to get a new lawyer and could not afford a
>        new one, one would be appointed for you free of charge?
>
> A:     Yes.

---

[4] The December 5 hearing was conducted in accordance with *United States v. Foster*, 469 F.2d 1 (1st Cir. 1972).  Under *Foster*, it is the duty of the trial court "to comment on some of the risks confronted where defendants are jointly represented to insure that defendants are aware of such risks, and to inquire diligently whether they have discussed the risks with their attorney, and whether they understand that they may retain separate counsel, or if qualified, may have such counsel appointed by the court and paid for by the government."  469 F.2d at 5.  Although *Foster* only applies to cases to "criminal prosecutions where one attorney speaks for two or more defendants," *United States v. Sotomayor-Vazquez*, 249 F.3d 1, 16 (1st Cir. 2001), the Magistrate Judge applied that standard to ensure that defendant knowingly, voluntarily, and intelligently waived any potential conflict or advice-of-counsel defense on the record.

Q:      Have you had adequate time to talk to Ms. Miner about the conflict issues?

A:      Yes.

Q:      Have you had the opportunity to read the government's papers with respect to the conflict issue?

A:      Yes, Your Honor.

. . .

Q:      All right.  And Mr. Gorski, I understand that you met with an independent attorney, Mr. Kiley, to discuss these issues; is that correct?

A:      That is correct.

Q:      And did you have an adequate amount of time to talk to Mr. Kiley?

A:      Yes, I have.

Q:      And did you have the opportunity to discuss with him the advice of counsel defense?

A:      Yes, Your Honor.

Q:      Do you understand the seriousness of the charges against you?

A:      Yes, I do.

Q:      Do you understand that you face if convicted potentially lengthy jail time?

A:      Yes, Your Honor.

Q:      Now in view of these risks, are you willing to waive any conflict that may exist as a result of Ms. Miner's firm's prior representation of Legion Construction and her current representation of you?

A.      Yes, I do.

Q:      And are you making this decision freely, voluntarily with full knowledge of the risks created by the conflict issues?

A:      Yes, I am.

Q:     And you signed a letter in July saying that you agreed to waive any conflict that
       we talked about now. Do you stand by the statements in that letter today?

A:     Yes, Your Honor.

Q:     And are you willing to waive an advice of counsel defense?

A:     Yes.

Q:     And are you making that decision freely, voluntarily with full knowledge of the
       risks of that decisions?

A:     Yes, I am.

(*Id.* at 11:2-13:12).

On January 2, 2014, the Magistrate Judge denied the motion to disqualify on the grounds

that (1) defendant had waived the advice-of-counsel defense and (2) the government had not met

its burden in asserting that Mintz Levin's communications with Legion were subject to the

crime-fraud exception. The government did not appeal that denial within the 14-day period

required by Fed. R. Crim. P. 59(a).

On June 16, 2014, the government filed a motion for leave to file a motion for

reconsideration and a motion for reconsideration of the Magistrate Judge's decision. In the

alternative, the government requested an *in camera* inquiry into Mintz Levin's communications

with Legion under *United States v. Zolin*, 494 U.S. 554 (1989), to determine whether the crime-

fraud exception applies.

On July 21, the Court heard oral argument on the pending motions. At oral argument, the

Court granted the government permission to issue subpoenas to Mintz Levin and Legion under

Fed. R. Civ. P. 17(c) for certain communications that may be relevant to the inquiry.[5]

_____

[5] The court expressly stated that it was taking no position as to whether the communications at issue were
relevant, admissible, or subject to a valid claim of attorney-client privilege.

## II.     __Motion for Leave to File__

In criminal cases, a party may object to a magistrate judge's order on nondispositive matters.  Fed. R. Crim. P. 59(a).  Objections must be filed within 14 days, and failure to object in a timely manner waives a party's right to review.  *Id.*  However, "[d]espite the waiver provisions, the district judge retains the authority to review any magistrate judge's decision or recommendation whether or not objections are timely filed."  Fed. R. Crim. P. 59 advisory committee's note (2005); *see also Thomas v. Arn*, 474 U.S. 140, 154 (1985).

"The remedy, if any, of a dissatisfied party who failed to object should be by way of a motion for reconsideration disclosing the grounds."  *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603, 605 (1st Cir. 1980).  Although no rule of criminal procedure explicitly authorizes motions for reconsideration in criminal cases, the Supreme Court has recognized the legitimacy of "a timely motion for rehearing or reconsideration of a judgment in a criminal case . . . ." *United States v. Morillo*, 8 F.3d 864, 868 (1st Cir. 1993); *see also United States v. Healy*, 376 U.S. 75, 78-79 (1984) ("We have recently recognized the appropriateness of petitions for rehearing . . . in criminal cases . . . .  The practice of the Court has been to treat such petitions as having the same effect . . . as do similar petitions in civil cases . . . .").

The Magistrate Judge's order in this matter was issued on January 2, 2014.  The government did not file timely objections to the order.  Instead, it filed a motion to reconsider the order on June 16, almost six months after objections were due.  The government contends that "it has become apparent to the government during the preparation of 'substantial' motions *in limine* that Attorney Miner's continued representation of Gorski may . . . ripen to an issue mid-trial if the defendant claims a lack of intent to defraud."  (Docket No. 106 at 1).  It has not, however,

10

presented any argument as to why it could not have raised the contentions in the motion for reconsideration in a timely fashion, other than the fact that it relied on defendant's waiver.

However, the issues raised by the motion may have serious consequences for the trial of this case, which is scheduled to start on September 29, 2014. The Court has "full authority to decide whether to refer a case to the magistrate, to review the magistrate's report, and to enter judgment," and nothing "preclude[s] further review by the district judge, *sua sponte* or at the request of a party, under a *de novo* or any other standard." *Thomas*, 474 U.S. at 154. The issues raised do not merely implicate the attorney ethical issues; they may also have substantial constitutional dimensions because they potentially implicate defendant's Sixth Amendment right to counsel. Under the circumstances, the more prudent approach is to consider the government's motion to reconsider on the merits, in order to reach the underlying issues.

In doing so, the Court will treat the government's motion as if it were a timely-filed objection to the Magistrate Judge's order. Under Rule 59, a district judge must "consider timely objections and modify or set aside any part of [a Magistrate Judge's] order that is contrary to law or clearly erroneous." Fed. R. Crim. P. 59(a). While the First Circuit has not discussed the meaning of "contrary to law," other courts have found that an order is contrary to law "when it fails to apply or misapplies relevant statutes, case law, or rules of procedure." *E.g.*, *Transamerica Life Ins. Co. v. Lincoln Nat. Life Ins. Co.*, 592 F. Supp. 2d 1087, 1092 (N.D. Iowa 2008) (quoting *Catskill Development, L.L.C. v. Park Place Entm't*, 206 F.R.D. 78, 89 (S.D.N.Y. 2002)). Under the "clearly erroneous" standard, a court "accept[s] both the trier's findings of fact and the conclusions drawn therefrom unless, after scrutinizing the entire record, [the court] 'form[s] a strong, unyielding belief that a mistake has been made.'" *Phinney v. Wentworth*

*Douglas Hosp.*, 199 F.3d 1, 4 (1st Cir. 1999) (quoting *Cumpiano v. Banco Santander P.R.*, 902 F.2d 148, 152 (1st Cir. 1990)).

### III.    Motion for Disqualification

#### A.    Relevant Law

##### 1.    Constitutional Framework

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his defense."  U.S. Const. amend. VI. Under that amendment, "there is a correlative right to representation that is free from conflicts of interest."  *Wood v. Georgia*, 450 U.S. 261, 271 (1981); *see also Reyes-Vejerano v. United States*, 276 F.3d 94, 98 n.3 (1st Cir. 2002).  "Although a presumption exists in favor of the defendant's selection of counsel, it may be overcome 'by a showing of a serious potential for conflict.'"  *In re Grand Jury Proceedings*, 859 F.2d 1021, 1024 (1st Cir. 1988).  In evaluating the potential for conflict, "the court may rely on counsel's representations that no such conflict exists."  *United States v. Santiago-Lugo*, 167 F.3d 81, 84 (1st Cir. 1999).

"Even where an actual conflict exists, however, a defendant may waive this conflict and elect to have the attorney continue representation, so long as that waiver is knowing, intelligent, and voluntary."  *Yeboah-Sefah v. Ficco*, 556 F.3d 53, 68 (1st Cir. 2009) (internal quotations omitted); *see also Mountjoy v. Warden, New Hampshire State Prison*, 245 F.3d 31, 36 (1st Cir. 2001) ("Even if defense counsel has a conflict, however, the court may sometimes allow the attorney to continue with the representation if the defendant makes a voluntary, knowing, and intelligent waiver.").  The trial court "bears the 'serious and weighty responsibility of determining whether there is an intelligent and competent and waiver by the accused,' and 'must

investigate as long and as thoroughly as the circumstances as the case before him demand.'"

*Yeboah-Sefah*, 556 F.3d at 68 (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 244 n.32 (1973) (internal alterations omitted)).

Even when a defendant has made a proper waiver of an actual or potential conflict of interest, "[i]t is within the district court's discretion to override a defendant's waiver of protection from a conflict of interest." *Santiago-Lugo*, 167 F.3d at 84. Although the First Circuit has not addressed what kinds of conflicts a defendant cannot waive, the Second Circuit has recognized a "narrow category of conflicts that . . . render[] a conflict unwaivable . . . ." *United States v. Schwarz*, 283 F.3d 76, 96 (2d Cir. 2002). According to the Second Circuit, a conflict is not waivable if "no rational defendant would knowingly and intelligently desire the conflicted lawyer's representation." *United States v. Cain*, 671 F.3d 271, 293-94 (2d Cir. 2012) (internal quotations omitted). As the First Circuit has recognized, "these cases tend to involve circumstances in which an attorney has reason to fear that a vigorous defense of the client might unearth proof of the attorney's criminality." *United States v. Saccoccia*, 58 F.3d 754, 772 (1st Cir. 1995); *see also United States v. Soldivelia-Lopez*, 17 F.3d 480, 487 n.4 (1st Cir. 1994) ("*Per se* Sixth Amendment violations have been found where trial counsel was implicated in the crime for which his client was on trial . . . .").

Disqualification of counsel is a remedy of last resort, and "[t]he government bears a 'heavy burden' in demonstrating that disqualification is justified . . . ." *In re Grand Jury Proceedings*, 859 F.2d at 1026.

## 2. Massachusetts Rules of Professional Conduct

Under Local Rule 83.6(4), the Massachusetts Rules of Professional Conduct govern the

ethical obligations of attorneys in this Court.  Three of those rules are potentially relevant.

First, Rule 1.7(b) provides as follows:

(b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:

(1) the lawyer reasonably believes the representation will not be adversely affected; and

(2) the client consents after consultation.  . . .

Mass. R. Prof'l C. 1.7.  However "when a disinterested lawyer would conclude that the client should not agree to the representation under the circumstances, the lawyer involved cannot properly ask for such agreement or provide representation on the basis of the client's consent."

*Id.* cmt 5.

Second, Rule 1.10 provides as follows:

(a) While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rule 1.7 . . . .

(d) When a lawyer becomes associated with a firm, the firm may not undertake to or continue to represent a person in a matter that the firm knows or reasonably should know is the same or substantially related to a matter in which the newly associated lawyer (the "personally disqualified lawyer"), or a firm with which that lawyer was associated, had previously represented a client whose interests are materially adverse to that person unless:

(1) the personally disqualified lawyer has no information protected by Rule 1.6 or Rule 1.9 that is material to the matter ("material information"); or

(2) the personally disqualified lawyer (i) had neither substantial involvement nor substantial material information relating to the matter and (ii) is screened from any participation in the matter . . . .

Mass. R. Prof'l C. 1.10.

Finally, Rule 3.7 provides as follows:

(a) A lawyer shall not act as an advocate at a trial in which the lawyer is likely to be a necessary witness . . . ;

(b) A lawyer may act as advocate at a trial in which another lawyer in the lawyer's firm is likely to be called as a witness unless precluded from doing so by Rule 1.7 or Rule 1.9.

Mass. R. Prof'l C. 3.7.

## B. Potential Basis for Disqualification

The question in this case is whether, notwithstanding defendant's waiver of any potential conflicts of interest, the constitution or the Massachusetts Rules of Professional Conduct require attorney Miner's disqualification. The constitutional question is whether "no rational defendant would knowingly and intelligently desire [Miner's] representation." *Cain*, 671 F.3d at 293-94 (internal quotations omitted). The basic question under the Massachusetts ethics rules is whether "a disinterested lawyer would conclude that the client should not agree to the representation under the circumstances." Mass. R. Prof'l C. 1.7 cmt. 5.

The government contends that attorney Miner should be disqualified for two reasons. First, it contends that attorneys from Mintz Levin could be called as witnesses if defendant asserts an advice-of-counsel defense. Second, it contends that attorneys from Mintz Levin could be called as witnesses because their communications with Legion are admissible and not protected from disclosure under the crime-fraud exception.

## 1. The Advice-of-Counsel Defense

An advice-of-counsel defense is a somewhat amorphous term that has different meanings in different contexts. As a general matter, the issue arises when a party who is alleged to have performed an act intentionally or willfully contends that he or she did so on the advice of counsel, and therefore did not have the requisite intent. *See, e.g., In re Mascolo*, 505 F.2d 274,

277 (1st Cir. 1974) (in the context of alleged bankruptcy fraud, "explanation by a bankrupt that he had acted upon advice of counsel who in turn was fully aware of all the relevant facts generally rebuts an inference of fraud" on the bankruptcy court); *Freedman Seating Co. v. American Seating Co.*, 420 F.3d 1350, 1356 (Fed. Cir. 2005) (in the context of patent litigation, a party may "invoke the advice of counsel defense to the charge of willful infringement"); *G.S. Enters., Inc. v. Falmouth Marine, Inc.*, 410 Mass. 262, 275 (1991) (describing advice-of-counsel defense to the intentional tort of malicious prosecution under Massachusetts law).

In criminal cases, the "thrust of [the defense] is that the defendant, on the basis of counsel's advice, believed his conduct to be lawful and thus could not be found to have had unlawful intent." *United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1194 (2d Cir. 1989). More specifically, the term "advice of counsel defense" has a specific, relatively narrow meaning and a broader, somewhat more colloquial, meaning.

First, under certain defined circumstances, a defendant may assert an advice-of-counsel defense and have the jury instructed to that effect. In order to assert that defense, a defendant must establish that:

> (1) before taking action, (2) he in good faith sought the advice of an attorney whom he considered competent, (3) for the purpose of securing advice on the lawfulness of his possible future conduct, (4) and made a full and accurate report to his attorney of all material facts which the defendant knew, (5) and acted strictly in accordance with the advice of his attorney who had been given a full report.

*Liss v. United States*, 915 F.2d 287, 291 (7th Cir. 1990); *see also Any v. United States*, 47 F.3d 1156, at *4 (1st Cir. 1995) (citing *Liss* with approval) (table decision).

Because it is an affirmative defense that tends to negate an element of the offense (that is, the necessary intent to commit the crime), a defendant need not affirmatively prove the defense.

16

*See Smith v. United States*, 133 S. Ct. 714, 719 (2013) ("The [s]tate is foreclosed from shifting the burden of proof to the defendant . . . when an affirmative defense *does* negate an element of the crime." (internal quotations omitted) (emphasis in original)). Instead, a defendant has a burden of production to establish a *prima facie* defense of advice of counsel. *See United States v. Gonzales*, 58 F.3d 506, 512 (10th Cir. 1995) (describing defendant's burden when asserting advice-of-counsel defense); *see also United States v. Shinderman*, 515 F.3d 5, 14 (1st Cir. 2008) (describing defendant's burden when asserting entrapment defense that negates a crime's *mens rea* element). The defendant would then be entitled to the requested instruction, and the government's burden to prove every element of the offense beyond a reasonable doubt, including the necessary *mens rea*, would encompass the burden to prove that defendant did not reasonably rely on counsel's advice. *See Gonzales*, 58 F.3d at 512 ("[T]he law places no burden on any defendant to prove an affirmative defense *beyond a reasonable doubt*," but "the law does place *some* burden on the defendant to prove [an advice-of-counsel] defense . . . ."); *see also Shinderman*, 515 F.3d at 14 (defendant's burden when asserting entrapment defense is "merely a burden of production; once it is satisfied, the government must prove beyond a reasonable doubt that no entrapment occurred").

The second, and broader, sense of the term arises when a criminal defendant seeks to introduce evidence, or argue to the jury, that the advice or involvement of a lawyer tended to negate his *mens rea*, even if the defendant could not establish all the elements of the formal defense. For example, a defendant might testify that he negligently, but not intentionally, failed to provide a complete set of facts to the lawyer, or that he received accurate advice but innocently misinterpreted it. That would not qualify for an advice-of-counsel defense in the

formal sense; nonetheless, such evidence would surely be admissible on the issue of defendant's state of mind.

Under either scenario—that is, either a formal advice-of-counsel defense or a more basic lack-of-*mens-rea* defense—a defendant's decision to raise the advice or involvement of counsel may serve as a waiver of the attorney-client privilege. That rule is premised on notions of basic fairness and common sense. Put simply, a defendant cannot have it both ways; he cannot claim he relied in good faith on the advice of counsel while using the privilege to prevent inquiry into the nature of his interactions with that counsel. *See In re Keeper of Records (Grand Jury Subpoena Addressed to XYZ Corp.)*, 348 F.3d 16, 24 (1st Cir. 2003) (noting that the assertion of an advice-of-counsel defense waives the attorney-client privilege between the defendant and the attorney whose advice he or she relied on; "[w]ere the law otherwise, the client could selectively disclose fragments helpful to its cause, entomb other (unhelpful) fragments, and in that way kidnap the truth-seeking process."); *see also* 1 McCormick On Evid. § 93 (7th ed.) (in actions where "a party interjects that the 'advice of counsel' as an essential element of a claim or defense, then that party waives the privilege as to all advice received concerning the same subject matter."). Nor can he engage in selective disclosure, revealing some communications and claiming the privilege as to others. *In re Keeper of Records (Grand Jury Subpoena Addressed to XYZ Corp.)*, 348 F.3d at 24.

Not every passing reference to counsel will, however, trigger a waiver of the privilege. *See, e.g.*, *United States v. White*, 887 F.23d 267, 271 (D.C. Cir. 1989) ("A general assertion lacking substantive content that one's attorney has examined a certain matter is not sufficient to waive the attorney-client privilege."). Whether such a waiver is triggered necessarily depends

on the facts and circumstances of the case. *See In re Grand Jury Proceedings*, 219 F.3d 175, 187-90 (2d Cir. 2000). The touchstone is fairness; a defendant cannot put his attorney's advice or involvement at issue in a case and then claim a privilege as to the details of that advice or involvement.

         a.        **Effect of Assertion of Advice-of-Counsel Defense on Attorney Disqualification**

Here, as noted, attorney Miner was formerly a partner at the Mintz Levin law firm, which was the firm that handled the bid protest and corporate restructuring, and either drafted the Ianuzzi affidavit or had a significant role in its preparation. Attorney Beirne is a non-equity partner at Mintz Levin.

The potential conflict arises from the involvement of Mintz Levin in the underlying events. Counsel for Gorski has suggested that he will, in at least some fashion, seek to refer to that involvement in the course of his defense. Whether to do so, and how to do so, and how to assess the likely consequences (including the possibility of a waiver of attorney-client privilege) will require a series of judgment calls at a variety of stages. Among other things, trial counsel will have to decide whether to align defendant with Mintz Levin (for example, arguing that the firm gave appropriate advice) or against it (for example, arguing that the firm misled him or committed malpractice). And the circumstances could change, depending on the rulings of the Court or the testimony of the trial witnesses.[6]

In any event, and at a minimum, lawyers at Mintz Levin are potential witnesses at trial. If attorney Miner herself had participated in the events in question, that would create an

---

[6] A further potential complication is that any privilege may in part belong to Legion, rather than Gorski individually. *See In re Grand Jury Subpoena*, 274 F.3d 563, 571 (1st Cir. 2001).

additional layer of problems. First, if Miner did not testify, she might nonetheless act as an "unsworn witness" who could "subtly impart[] to the jury [her] first-hand knowledge." *United States v. Evanson*, 584 F.3d 904, 914 (10th Cir. 2009) (quoting *United States v. Locascio*, 6 F.3d 924, 933 (2d Cir. 1993)).[7] Second, if Miner did actually testify, she could be "in the untenable position of providing testimony against [her] client." *Id.* However, it appears that neither attorney Miner nor attorney Beirne participated in the underlying events, and thus they are not potential witnesses, and their names are not likely to arise at trial in connection with the underlying facts.[8]

There is, however, another more fundamental, potential conflict. Under the circumstances presented here, attorney Miner could have divided loyalties that might affect the nature of any advice she might give to Gorski, or any trial strategy she might pursue. That issue is mitigated, but by no means eliminated, by her departure from Mintz Levin; having practiced at the firm for many years, she presumably retains many friendships with, and loyalties to, her former colleagues. Furthermore, attorney Beirne remains at the firm, where he is a partner.

The potential for a substantial conflict of interest is therefore clearly present. The next

---

[7] According to the First Circuit, the "unsworn witness" rule "operates almost exclusively in criminal cases, where, typically, the attorney was present at the criminal act in question." *Fonten Corp. v. Ocean Spray Cranberries, Inc.*, 469 F.3d 18, 23 (1st Cir. 2006). Although the First Circuit has not adopted the "unsworn witness" rule, it has noted, in a civil case, that "attorney disqualification [under the rule] is a drastic remedy reserved for cases where the attorney has entangled himself to an extraordinary degree with his client." *Id.* (internal quotations and citations omitted).

*Fonten* was a breach-of-contract action where the trial counsel for the defendant had represented the defendant in the negotiations surrounding the contract. *Id.* at 20. The plaintiffs contended that the attorney's presence at trial as an "unsworn witness" lent undue credibility to the defendant's witnesses because she was present during the contract negotiations. *Id.* at 23. The First Circuit declined to grant the plaintiffs a new trial, holding that even assuming she was an "unsworn witness," plaintiffs could provide no specific examples of prejudice caused by the attorney's presence. *Id.*

[8] In any event, the "unsworn witness" issue can be substantially mitigated simply by not telling the jury that the attorneys have (or had) any connection to Mintz Levin.

questions are whether it can be waived, and if so whether the waiver that was executed is sufficient.

### b.      <u>Waiver of Conflict of Interest</u>

Based on the circumstances presented here, it appears that the conflict is waivable, both as a constitutional matter and under the Massachusetts rules of professional conduct.  It is not for the Court to decide whether waiver is wise or prudent; the only issue is whether it is acceptable under the law.  Indeed, the government only contends that attorney Miner's representation would be prejudicial.  It does not contend that no rational defendant would refuse to waive the defense or that a disinterested lawyer would conclude that defendant should not allow attorney Miner to represent him.  And the Court should not interfere with a defendant's choice of counsel except under compelling circumstances, which do not appear to be present here.  *See In re Grand Jury Proceedings*, 859 F.2d at 1026.

The issue then is the scope and nature of the waiver that has already been executed.  The Magistrate Judge declined to disqualify Miner based on a potential "advice-of-counsel" defense.  In doing so, she credited defendant's contentions that such a defense would be inconsistent with his trial strategy and would require him to admit that the Ianuzzi affidavit was false.  (Docket No. 74 at 12-13).

Both parties agree that defendant has knowingly and intelligently waived what was referred to as the "advice-of-counsel" defense.  The government, however, contends that the Magistrate Judge erred because her reliance on defendant's waiver was misplaced.  It contends that defendant could argue that he did not have the intent to defraud the United States because he hired Mintz Levin to effectuate Ianuzzi's buyout of Steen in an appropriate manner.  Any

argument "along this vein," the government contends, "would unfairly interject the credibility of counsel's firm at trial or otherwise vouch for [defendant's] conduct." (Docket No. 107 at 10). This "may lead to a situation where . . . Miner is representing Gorski as an advocate while lawyers from her firm essentially vouch for his actions or the actions of his coconspirators during the conspiracy." (*Id.* at 11). The government further contends that lawyers for Mintz Levin need not actually testify for this conflict to occur, because defendant or Ianuzzi could "testify at trial that they retained Mintz Levin to ensure that the corporate restructuring and bid protest were handled legally." (*Id.*).

In substance, therefore, the government is arguing that defendant has waived a conflict only as to the formal "advice-of-counsel" defense, and not as to the broader issue of a lack-of-*mens-rea* defense based on the involvement of counsel. And defendant appears to contend that he will in fact argue that the jury can infer he was acting in good faith because he retained Mintz Levin, but will not contend that he believed what Legion did was legal because he followed Mintz Levin's specific legal advice.

As noted, defendant waived what was referred to as the "advice-of-counsel" defense on the record after consulting independent counsel. The waiver, as far as it went, satisfied the requirements of both the constitution and the Massachusetts Rules of Professional Conduct. *See Yeboah-Sefah*, 556 F.3d at 68; Mass. R. Prof'l C. 1.7(b). Under the circumstances, the Magistrate Judge's reliance on defendant's waiver of any advice-of-counsel defense was not clearly erroneous or contrary to law.

Nonetheless, it appears to the Court that the waiver was not as broad as it should have been under the circumstances. The waiver of the formal defense did not necessarily extend to or

address all of the potential sources of conflict.  Defendant therefore has not waived, or at least not clearly waived, the conflict in all respects:  in particular, as to the issue of the potentially divided loyalties of counsel.  A new colloquy and waiver is therefore in order if defendant is to proceed with attorney Miner as his counsel.  That colloquy and waiver should not only address, in broader terms, the ways in which the potential for divided loyalties might affect attorney Miner's advice, but should also address the issue of Beirne's participation in the trial.

Accordingly, the motion for reconsideration will be denied, subject to the execution by the defendant of a more complete colloquy and waiver concerning the potential conflict of interest.  That denial is based on the evidence presently before the Court, and is without prejudice to the renewal of a motion to disqualify as changing circumstances may warrant.

### 2.      <u>Crime-Fraud Exception</u>

The other issue raised by the government, and considered by the Magistrate Judge, is the possible effect of the crime-fraud exception to the attorney-client privilege.  The government's view is that Gorski employed the services of Mintz Levin in order to perpetrate a crime or fraud upon the VA.  At the time of the hearing before the Magistrate Judge, that issue was somewhat abstract; the government had not sought to compel the production of any documents or testimony to which the privilege might attach.  Since that time, however, the government has issued subpoenas to both Mintz Levin and Legion under Fed. R. Crim. P. 17(c), and has sought a hearing under *United States v. Zolin*, 491 U.S. 554 (1989), to determine whether the crime-fraud exception should apply.  That issue will be addressed at a hearing to be held within the next few days.

The resolution of that issue could, conceivably, change the landscape of the

23

disqualification motion to a considerable extent. Among other things, it is possible that new evidence will surface concerning the role of Mintz Levin in the restructuring and the creation of the Ianuzzi affidavit. The Court will address that issue, should it arise, at a subsequent stage of this proceeding.

IV.    **Conclusion**

    For the foregoing reasons, the government's motion for leave to file is GRANTED. The motion for reconsideration is DENIED, subject to the execution by the defendant of a more complete colloquy and waiver concerning the potential conflict of interest consistent with this opinion. That denial is without prejudice to the renewal of a motion to disqualify as changing circumstances may warrant.


**So Ordered.**


                                                     /s/ F. Dennis Saylor
                                                    F. Dennis Saylor IV
Dated: August 1, 2014                               United States District Judge